director, etc. We'll hear first from Mr. Bindman and then Ms. Brodbeck. Thank you, Your Honor, and may it please the court, my name is Jevin Bindman, and I represent the appellant, Douglas Tyrone Armstrong. This case arises from the district court's denial of Mr. Armstrong's petition for writ of habeas corpus. Under the AEDPA, a petitioner in state custody is entitled to relief if the state court unreasonably applies clearly established federal law. Even under this deferential standard, Mr. Armstrong is entitled to relief because this case is one of the rare extreme malfunctions in the state criminal justice system that this court is obliged to correct. There can be no fair-minded disagreement that the state court misapplied the two-pronged test in Strickland v. Washington. Trial counsel, who provided ineffective assistance at the sentencing phase, conducted a constitutionally deficient pretrial investigation, and the result of trial is reasonably probable to have been different but for counsel's failure to uncover critical eyewitness and forensic evidence. This court should reverse the decision of the district court and remand with instructions to grant the petition. The Sixth Amendment requires an attorney to interview potential witnesses and make an independent investigation of the facts and circumstances of the case. But when Mr. Armstrong's lead trial counsel was asked about his obligation to perform a pretrial investigation, he acknowledged that duty, and yet he responded, did I do it? No. If he had performed, if trial counsel had performed even a minimal pretrial investigation, they would have uncovered the testimony of Faustino Barrera, the victim's next-door neighbor who lived less than 50 feet away from where the attack first occurred. Mr. Barrera would have testified that the attack occurred 20 minutes before he heard the sirens approaching and when the state's eyewitnesses were at the crime scene. Now, a local TV news station Well, you're saying he would have testified that the attack occurred, he would have testified about hearing a scream, isn't that right? He would have testified that he heard Mr. Castellan cry out, why me, in Spanish, in such a way that made him fear for his life such that he wouldn't even look out the window to see what would have occurred. And you're not calling him an eyewitness. An earwitness may be a better term to describe what Mr. Barrera heard at that time. I agree that he did not see anything. Now, a local TV crew found Mr. Barrera a few days after the murder, but somehow trial counsel didn't find him. Trial counsel did hire an investigator who performed a day and a half of work for a capital murder case. Mr. Tamez, the investigator, requested the opportunity to canvas the area and knock on doors and was never granted that opportunity by trial counsel. Now, going along with Mr. Barrera's testimony is the testimony of Mr. Guerra, a laundromat owner who saw Mr. Armstrong the night of the murder, just a few minutes before it occurred. Now, the case is in Guerrera, but because of the deficient investigation and failure to find Mr. Barrera, they didn't understand the importance of his testimony. Mr. Guerra would have testified that he saw Mr. Armstrong just a few minutes before he heard sirens and saw the approach of the police cars to the crime scene. So if we take these two, I guess, eyewitness and earwitness together, we have an alibi for Mr. Armstrong that he was not, he was blocks away from the crime scene when the attack actually occurred. And furthermore, we can pinpoint these witnesses' testimony based on the hearing of the sirens. So Mr. Armstrong and then just a few minutes later heard the sirens. Mr. Barrera heard the attack occur 20 minutes earlier and then 20 minutes later heard the sirens. So we can use the sirens as a point of reference for the testimony of both men to corroborate the alibi that Mr. Armstrong was not there at the time. Now, we add on top of that the failure to perform an effective forensic investigation. Trial counsel noted when they visited the crime scene that there were inconsistencies between what the state's eyewitness said they saw and the actual crime scene itself. Now, had they uncovered any forensic evidence, it would have shown, number one, that the victim, that there was a single wound that ultimately killed the victim and that was a cut to his jugular vein. That wound must have occurred over at the sidewalk based on the pool of blood that was there. And number three, the victim could not have walked 30 feet unassisted over to the alleyway where he died. The importance of that is that that fully corroborates Mr. Armstrong's police statement, which was played to the jury, that he was trying to assist Mr. Castellan, the victim, to receive assistance for his wounds. It is inconsistent with what the state's eyewitnesses saw. The state's eyewitnesses, whose story was embellished over time, what they claimed they saw was that Mr. Armstrong was fighting with the victim, that the victim was trying to get away from Mr. Armstrong, and that they saw Mr. Armstrong slash his throat. Well, that is not consistent with what the forensic evidence would have shown, which is that the victim did not have the ability to be fighting or running away from Mr. Armstrong. And your complaint is that the jury never heard that? Exactly. The jury never heard this evidence. And if they had had the opportunity to hear it, not only would it have explained Mr. Armstrong's statement, but it would have lended credibility to his version of events, why he was there, why he panicked, why he fled. All of this comes into greater focus. Instead, what happened was that Mr. Armstrong's testimony was on an island. The trial counsel did not provide the jury any reason to believe his statements. And the other point I'll make is that this is an eyewitness case, and this court has ruled on several occasions that when you have an eyewitness case, when you have a case that is, that in which eyewitness testimony is the cornerstone of the prosecution's case, that the, if there's any additional evidence that would tend to show that the eyewitnesses didn't see what they thought they saw, that that is critical to establishing prejudice in the habeas context. Here, we have eyewitnesses who witnessed what they thought was an attack, but it was dark. Their stories changed substantially over the course of the several months between the crime occurring and the trial, and it's inconsistent with what the crime scene saw. Counsel noted that. The trial counsel noted that, and yet they did not perform any sort of investigation to provide forensic evidence to the jury to explain why that was important. How does the later found knife fit into this evidentiary pattern, as you see it?  How does the knife that was found later fit into your evidentiary pattern, as you describe it? What do you say about the knife? Well, as trial counsel noted, there was no DNA or fingerprint evidence found on the knife. There's nothing, there's no physical evidence to connect that to Mr. Armstrong, and again, if. Was there any other evidence that connected it to him? They were looking for a knife, and there was some focus on it, and I didn't know why, other than the nature of the wound. Yeah, there's no evidence that connects Mr. Armstrong to the knife, of course, other than where it was found, and where it was found is, there's some, I guess, strange, the magistrate judge even said that it was odd that they didn't find it within three days. It was in what seemed to be a pretty open area, but I think the important point about the knife is that without any other corroborating evidence, without the cumulative evidence that habeas counsel developed, the jury had no reason to believe Mr. Armstrong's statement that he didn't have anything to do with the knife. I guess I understand how corroborating evidence could be beneficial, but for you to conclude that the jury had no reason to believe him, I guess is to say that they found him wholly incredible. I mean, you can find someone credible without any corroboration, can't you, as a juror? Well, Your Honor, what I would say to that is that if we're weighing the credibility of the state's eyewitnesses versus Mr. Armstrong, trial counsel could have uncovered evidence that would have lent credibility to Mr. Armstrong's statement, while at the same time showing that the state's eyewitness, repudiating the state's eyewitness's testimony. They did neither of those things. So we have Mr. Armstrong's testimony standing by itself, and the state's eyewitnesses essentially went virtually unchallenged. And that's the problem here, if you look at all of the evidence that has been uncovered, that the cumulative effect of that evidence is to greatly strengthen Mr. Armstrong's credibility. I think that the best analogy for this case is the Hughes case, which this court just decided about six months ago. In that case, the trial counsel failed to interview the state's primary eyewitness, and that, if he had done so, the eyewitness's roommate would have been within the reasonable scope of the investigation. Because he didn't, the trial counsel never found the roommate who had important evidence to discredit the eyewitness's testimony. The same thing here. All trial counsel had to do was go knock on the door next door to Mr. Castellon. This is not a huge lift. They hired an investigator who could have done that, but they never authorized him to do so. And because of that, they never uncovered the testimony that would have shown that there was an attack on Mr. Castellon 20 minutes prior to the incident. And similarly, on the prejudice prong in Hughes, this court concluded that the roommate's testimony would have cast doubt on the eyewitness sufficiently to establish prejudice, even under the deferential standard of the AEDPA. And here, the same applies, where you have not only the eyewitness, or the eyewitness testimony of Mr. Barrera, the testimony of Mr. Guerra showing that the, that Mr. Armstrong would have. The band came up with Corona and Rays, and they testified, or did they ID the defendant? Talk to me about that. What's the weakness in that identification? Well, there's no dispute, Your Honor, that Mr. Armstrong was there, that he was, that he was with the victim. And the weakness there is that the eyewitnesses, the state's eyewitnesses testimony is not consistent with the crime scene evidence. And if there had been any sort of forensic evidence completed at the crime scene, that would have become readily apparent. I mentioned the pool of blood that was closer to the sidewalk than where he died. We know that ID testimony is not inevitably correct. We know, in fact, that it's often deeply flawed, contrary to our understanding, that we have an eyeball witness sometimes. So I accept that weakness inherent in that type of testimony. But I wondered if there was any evidence that's recognized, how that, did that testimony evolve? Was that, how did they come forward and identify that particular individual? At what point did they first ID the defendant? Sure. Your Honor, the, I believe one of the two state's eyewitnesses positively identified Mr. Armstrong, either the night the murder occurred or the night after, or the day after. But that was really the only consistent part of her testimony. And if you, if you look at her initial police statement with, compared to the one that she made several days later and then a couple of weeks after that, and then several months after that, it became increasingly embellished. And what began as two men jumping together, which is consistent with Mr. Armstrong's statement that he was carrying a dying man, became Mr. Armstrong throwing him to the ground and repeatedly slashing his throat and then rifling his hands through his pockets. None of that, none of that statement was in the eyewitness's initial account of what she saw. And that's the critical difference here as to why the eyewitness accounts are, are subject to fallibility, as Your Honor noted. And as we've all learned over the past 10 to 15 years, that, that eyewitness testimony is, is subject, inherently subject to fallibility. And so he doesn't contest though, what the, that the eyewitnesses saw him at the scene with the victim? That is correct. Yeah. It's undisputed that he was, he was there. He just contends that what they say occurred is not what happened. So is he saying they didn't see what they say they saw or they're making it up? He's saying that they didn't, that they didn't see what they thought they saw. And, and one thing I'll, I'll note, Your Honors, is if you look at the crime scene photos in the record, those are well lit by police, by police lights. If you were actually at the scene at the time, you would have, there would have been one streetlight off to the side. So that plus the headlights would have been the only lighting that the eyewitnesses would have had. I'll reserve the rest of my time for rebuttal. Thank you. Yeah, please. The court in this case, Your Honors, the appellant admitted being at the crime scene. He was covered in the victim's blood. He had the victim's property on him and he faced two eyewitnesses who, despite argument today, were clear and adamant from the beginning that the appellant killed the victim. He was killing him and he was not helping him. Thus, his trial attorneys, Garza and Morales, they had their work cut out for them. They reasoned that they should focus on these two eyewitnesses and that is a very reasonable approach to trial, especially when considering the strong amount of evidence against their client. For a different verdict, the appellant would need to somehow convince the jury that these two eyewitnesses lied under oath or somehow didn't see what they saw when they had absolutely no motive to lie under oath. And the jury would have to ignore his flight from the crime scene and his hiding and discarding any and all evidence that connected him to the death of the victim. All of this recent evidence that the appellant brings forth, it doesn't change his defense. Garza and Morales told the exact same story, they just did it in a different way. In other words, the appellant disagrees with the strategy of the trial attorneys, which Strickland clearly prohibits. What did these two eyewitnesses say about the weapon? How did they describe the weapon that was used? They did not. They did not see a weapon. Did they make any reference to it being a box cutter at all? They did not. In this case, the state did find a box cutter and it did have the victim's blood on it. It wasn't connected to, through forensics, to the appellant. But trial attorneys, through their investigator, Tamez, did interview the appellant's girlfriend, LaSoya, who testified at punishment. I thought they said that the attacker sliced, cast the land repeatedly with a fold-out knife box cutter. Yes. And rifled through it. Yes, Your Honor. It was the box cutter that they found behind the bar. My question is, what did the eyewitnesses say about the knife? And you said nothing. They did not see a knife. They did not see a knife. They did not describe any blue box cutter. The trial attorneys were more afraid of LaSoya being found. Where did the police derive that it was a box cutter that they were looking for? They found a blue box cutter. I know. They found one later. Yes. But they were just out searching for a weapon of some kind. Yes. So they didn't know at the outset that it was a box cutter. They did search the area. They found a blue box cutter with the victim's blood on it, Your Honor. And that is why they came to the conclusion it was the murder weapon. And again, the trial attorneys were afraid of the state calling LaSoya on at the guilt innocence. They did at the punishment and confronted her with her police statement that the appellant carried a blue box cutter with him every day or most of the time. Garza Morales had to approach this case in a real world situation. They had limited time and limited resources. They didn't have years to investigate this case. And Garza, being a former police officer, he carried with him a wealth of information as that former police officer. In this case, the appellant faced 12 witnesses from either the police department, the sheriff's department, or the school district's police department. What was the prior relationship between the two of these two witnesses who had ID'd the defendant? What was their prior relationship with him? They had dated before. But by the time the investigator, Tamas, for the defense had interviewed them, they had already broken up. And that was a few months after the murder. So they arrived. My question is, did they know him? Oh, I'm sorry, Your Honor. They did not know the appellant. They did recognize the victim, Mr. Castellon. When you say dated, you're saying way as a corona had dated. Yes, Your Honor. Corona and Reyes knew the victim, but they weren't familiar with the appellant. They just saw a person there that they could not identify who was doing this. At that time, they didn't know who he was. No, they didn't. And they did identify him later when he was found at the bar. I understand that, but they were unable to. What description did they give of him, if any? They described what he was wearing, but unfortunately, the appellant stripped off his clothes. I'm sorry, yes, you go. He stripped off all of his clothes. He changed his bloody shirt, and he changed his shirt again when he got to the bar. He got rid of his bloody ball cap. He washed his hands with beer to get rid of all the blood. I'm talking about your witnesses. Yes, I understand, Your Honor. They still identified him, despite his being in different clothes. They were still able to identify him. Well, they didn't see him changing the bloody shirt or any of that. No, they didn't. They just described his clothes. So is it the situation that you had two people that came on the scene, and they saw a man do whatever they thought he did and just disappear, and they didn't know who he was at that point? They knew where he ran off to. I'm sorry? They knew where he ran off to, Your Honor. They did what? Can you keep your voice up? They knew where he ran off to. I'm sorry, Your Honor. So they pointed the direction that he ran off to. They pointed the direction. My question is, did they, did they, did they, they didn't, they're unable, they didn't give them any description other than, they saw an individual, and later, your eyeball witnesses are witnesses, actually, that were given, given some kind of photographic pictures or something. When did they actually identify this defendant, is what I'm saying? They went, they were taken to the bar, and they identified him at the bar. And it's notable that the appellant isn't arguing that they didn't see him specifically. He admits being at the crime scene. And he, he was still covered in the victim's blood. He had to rip off a bloody section of his jeans when he was in the back of the police officer's vehicle and hit that section. There's, there's no debate that he was the person the two eyewitnesses saw, Your Honor. And the appellant is not contending that at this point. The two eyewitnesses arrived in a van, and Mr. Reyes was driving the van. And contrary to the argument earlier, he had his, his lights on. He was flashing the lights, honking his horn, trying to distract the appellant from attacking the victim. They said he was up against the fence. Both of them did. They found blood, the victim's blood, up against the fence. They are, they both testified that the victim was able to break free from the appellant briefly, and he reached for their back door, the back door of their van. There was, his blood was found on the back door of the van. And then they said the appellant caught up with the victim, grabbed him, and threw him onto the ground. Both eyewitnesses, while they were still in the van, testified that they heard the victim's head hit the ground. The medical examiner noted the bruising and abrasions on the back of the victim's head. The medical examiner also noted several cuts to the victim's neck and his cheek area, and to his thigh, and defensive wounds to his hand. So this wasn't a, a one-cut attack. This was several, several cuts to the victim in this case. Turning to the eyewitnesses, both Corona and Reyes were investigated and interviewed by Mr. Tamez. Mr. Tamez found that Corona did have priors. She had a forgery conviction, a burglary conviction, and she was investigated by CPS.  It just didn't matter. And also her inconsistencies, I say inconsistencies, but her embellishments along the way, that was also brought out in Cross, and it was argued extensively. You're dropping your voice and talking very fast. I'm sorry, Your Honor. I tell counsel, the acoustics in this courtroom over the years has dissipated. It's the courtroom's fault. Please keep your voice up. Yes, I apologize. I'll try to speak up as best I can. In this case, both Garza and Morales focused on these two eyewitnesses. It's a common approach when you have a client who admits being at the crime scene is covered in the victim's DNA, and it's not unreasonable then to not seek out further evidence that will inculpate your client by going the forensics route. So they decided to poke holes in the state's case. It was very reasonable then to also rely on what the appellant told them. He told them about Guerra, who was at the laundromat. They interviewed him. Notably, both Guerra and Barrera had inconsistent statements. Guerra told Tamez initially, I saw a black man. I don't really know appellant very well. I do know there's another black man in the area. So in order to prove that Guerra actually saw the appellant, the appellant would have to testify, and I'm sure that they did not want that to occur at the trial. To try to push Guerra to try to change his story, which it seems like it happens, he has inconsistent statements. He suddenly knows the exact time, five, I believe, several years after the murder, and he also is very clear he saw appellant when a few months after the murder, he did not have a timing of when this occurred, and he wasn't certain that he saw appellant. When did the defendant first come forward with his explanation that he had come upon the scene and attempted to put him over his shoulder and take him forward, et cetera? When did he first break that story? When did that first— That was the initial police statement he made. I'm sorry? That was the police statement he made, and that is how it came in front of the jury. He made that to the police when? Right after his arrest. Well, that's a very clever cover, if that's the state's viewpoint about it for a fellow that is not knowledgeable about the law to neatly create this defense. Yes, he wasn't consistent during the police statement. He himself started to embellish the story, but as Strickland states, we can spend a lot of time in deficiency, but this case can be easily resolved on prejudice, and in this case, you had two eyewitnesses who were consistent as to the main points, which I had earlier described. You had evidence that corroborated them, where the blood was found on the fence, the zigzag pattern at the crime scene, on the back of their van, and the medical examiner, and you also had his flight. You have a disconnect between what he says happened and what occurred. In this case, he said, I came across a bleeding victim and tried to help him to the police station, but then he changed his mind and said, well, I don't want this to be pinned on me, so it's inexplicable why he would want to go to the police station in the first place when he'd still probably still have to wait for an ambulance to arrive, and then he doesn't even ask for help. He doesn't knock on any doors in the area to see if someone could help. When the two eyewitnesses arrive in a van, he doesn't ask them for help. He runs and runs past several witnesses, and he doesn't ask them for help. He's flippant about it. He tells two witnesses who testified at the trial, hey, what's up? He says that, not, hey, there's a man who's bleeding profusely from his neck a few blocks back, and then when he gets to the bar, he still doesn't ask for help. The appellant's argument requires that the jury not use common sense. Counsel, do you have any explanation for this whole concern that they have about a pool of blood being in one place, and then if the victim had bled to the point that that size pool of blood was made, then he would have been unable to get to the other room. Is that the case in which the eyewitnesses testified to? I believe that Garza, sorry, Morales, the trial attorney, determined early on that she would not be using any blood spatter expert. Garza agreed when he came on a few months later. He used photographs and his argument and his cross-examination of the police officers to show this to the jury. He didn't believe that Dr. Rowe or Mr. Epstein would need to hold the hand of the jury. He believed that this was a better route than having guesswork, as they described it, for Dr. Rowe and Mr. Epstein. He also did testify at the state habeas hearing, having known the prosecutor for quite some time and worked opposite him, that Dr. Rowe particularly would have been eviscerated by the state on cross, so he didn't think that that would have been a good route. But again, Your Honor, the appellant, in order to win, in order to be granted relief— They would have been eviscerated because of his testimony in that particular case or because of his history of giving dubious testimony? Why is it that they certainly would have been eviscerated by the prosecution? I believe they both perceived it as guesswork, trying to understand how much blood is on the ground, how much is in comparison to where the body was found, and also how this attack happened. He had several cuts on his neck. He had a cut on his—he had several injuries. So both Dr. Rowe and Mr. Epstein couldn't tell the jury specifically what happened based just on blood spatter. And even if they had tried to get these forensic experts early on, there's no guarantee that this crime scene wouldn't have been washed by then. I know that there was at some point the crime scene had washed, so they would still need to look just at photographs of the crime scene. I did want to note that, as the appellant had argued, that this case is materially distinguishable from the Hughes case. In Hughes, an eyewitness from the state was not interviewed. It's understandable that that's deficient. In this case, both eyewitnesses and Mr. Guerra, who appellant claimed had seen him, all were interviewed, as well as LaSoya, the girlfriend, who testified later at punishment. In this case, Your Honor, the appellant would have to demonstrate that no reasonable jurist could disagree, meaning every single reasonable jurist would agree that he has proven both deficiency and prejudice in this case, in order to be granted relief. The appellant hasn't done that for deficiency, and he certainly has not done that for prejudice. That is why the director asked for the lower court's decision to be affirmed. If there are no further questions, thank you. Your Honor, the counsel for the state started her argument by saying that trial counsel decided to focus on the eyewitnesses. And focus on the eyewitnesses is correct, but the trouble here is that they did not investigate any evidence to remediate the eyewitness testimony. Instead, they decided to wing it on cross-examination, and rather than affirmatively provide forensic evidence that would have disproven what they thought they saw, and also they decided to rely on their closing argument, which of course is not evidence anyway. This is a quintessential unreasonable decision parading under the umbrella of strategy. In order to create a strategy, trial counsel had to uncover evidence that would provide them the knowledge requisite to figure out what the strategy should be, and they did not ever do that. Moreover, both the Supreme Court and this court have adopted the ABA standards for criminal representation. Those standards say that a trial counsel is required to investigate and interview potential witnesses unless there's an exigency which prevents it. Here, there can't possibly be any exigency. Mr. Barrera lived next door to Mr. Castelon. They would have had to knock on one door. That would have been the first door that they would go to. And when you layer on top of that the fact that lead trial counsel admitted that he did not perform the requisite pretrial investigation, this is bordering on the line of per se deficient. I'd like to respond to state counsel's statement that in order to corroborate Mr. Guerra's testimony that he saw Mr. Armstrong walking down the street, that Mr. Armstrong would have had to testify, and that's not correct because Mr. Armstrong said in his statement that he saw the laundromat owner walking down the street as he was walking down the street toward where the crime occurred. So he would not have had to testify in order for that to come in. Just very briefly on the box cutter, Your Honor, that you were asking about. Are you saying that statement in the police report was admitted into evidence at the trial? Correct. The police statement was played to the jury in lieu of Mr. Armstrong testifying. On the box cutter, the statement that keyed the police into looking for a box cutter was a statement by Mr. Armstrong's then-girlfriend, Ms. Lasoya. And Ms. Lasoya ended up not testifying at trial. There's obviously no—we don't know why, but it's— You're saying they had her statement before they found the box cutter. That's correct. Her statement was that he typically carried a blue box cutter. That's right. And then they— They go and they find a blue box cutter. Exactly. Exactly. So that—her statement, obviously, is not evidence. It would be hearsay and not admissible at the trial. It sounds like that receipt in the evidence, too. The ATB grocery receipt. The question of—well, there was a suggestion that the police had actually—it was like a throwdown. Some of the evidence was produced by investigators. That was the implication of some of the argument. Yes, Your Honor, and in this case, a reasonable investigation would have uncovered critical evidence that would have supported Mr. Armstrong's statement. Let me ask you a question about where exactly was this case tried? Where was the trial? What city or county? I believe it was Hidalgo County. I believe it was in Donna, Texas. What is the—how do they select the defense counsel? Was there a court-appointed counsel? It was court-appointed counsel. They don't have a dedicated defense bar, is my understanding, but the judge would appoint counsel to represent the— Local judge just appoints members of the bar who are known to be willing to accept those appointments? That's my understanding, Your Honor. And how—what's the source of the money to fund them? I'm not sure on that. I— Do you have any idea how well they were compensated or not? My recollection is it was more than $100 an hour, but less than $200 an hour. But I'm not sure about that. I'm sure that's in the record, but I don't have that. I'm just trying to get a sense of it. We see a lot of difficulties in capital prosecutions. Are there cases of this sort, capital or non-capital? Yes, and I would just add to that that 11 1⁄2 hours of investigation in a capital case is seriously deficient. If I may just close briefly, Your Honors. Well, I think I have one more question. Sure. The victim's medical card was found on Mr. Armstrong. Is that right? That is correct. It was found on Mr.—it was included in the inventory of evidence that was on Mr. Armstrong. Was there any suggestion at trial that that card was planted on Mr. Armstrong? There was suggestion at trial, Your Honor, to that fact, and— The jury heard that? The jury did hear that, but what they didn't hear is additional forensic evidence that there was a fingerprint on the Medicaid document that did not belong to Mr. Armstrong or the victim, and there was also the insole of a bloody shoe print that was on the Medicaid document that did not belong to either the victim or Mr. Armstrong, and that's the additional evidence that the jury could have heard. Which they didn't hear. They did not.  All right. Just in closing, Your Honor, Mr. Armstrong was entitled to an effective investigation by the Sixth Amendment, and to paraphrase the language of his trial counsel, did they do it? No. We ask that the court reverse the decision of the district court and remand with instructions to grant the petition. Thank you.